IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| SHANTERIA NOIEL, | § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 5:23-CV-00079-RWS |
| ROSELAND MANAGEMENT LLC, | § § § | |
| Defendant. | § § | |

## ORDER

Before the Court is Defendant Roseland Management LLC's Motion for Summary Judgment. Docket No. 45. This motion is fully briefed. Docket Nos. 56, 57. The Court heard argument on this motion. Docket No. 61. For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED**.

## BACKGROUND

On August 7, 2017, Plaintiff Shanteria Noiel is a black woman who began working as a Certified Medical Assistant for Charles R. Gordon M.D. P.A. d/b/a Precision Spine Care ("Precision"). Docket Nos. 56 at 8, 45 at 10–11. In November of 2018, Plaintiff became employed by Defendant Roseland Management LLC when Defendant purchased assets from Precision and retained some of its employees. Docket Nos. 56 at 8 n.1, 45 at 10. On February 7, 2023, effective February 10, 2023, Plaintiff informed Defendant that she was resigning because the mistreatment of black patients was so bad that she would "rather just do makeup." Docket Nos. 56 at 13–14, 45 at 18–19.

On April 28, 2023 Plaintiff filed a charge of discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC") against Precision, alleging that Dr. James

Wages and Nurse Practitioner Melinda Smith "made offensive derogatory comments about blacks" and that Plaintiff "quit because black patients were not treated as well as the white patients and because [she] could no longer work in an environment that was averse to blacks." Docket Nos. 45-23 at 10; 56 at 14.[1] The EEOC decided not to proceed with an investigation and made no finding on the merits of the claims disclosed within the charge. Docket No. 45-23 at 6.

Plaintiff then filed the above-captioned case. *See* Docket No. 1. Plaintiff's amended complaint asserts claims of hostile work environment, race discrimination, and constructive discharge under Title VII of the Civil Rights Act , as amended, 42 U.S.C. § 2000e, (Counts I–III); Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Counts IV–VI); and the Texas Employment Discrimination Act, as amended, Tex. Lab. Code. § 21.001 (Counts VII–IX). Docket No. 6 at 5–6. Plaintiff's claims arise from nine alleged incidents, listed below in approximate chronological order:[2]

> **Incident 1:** On or around Plaintiff's first day at Precision (August 7, 2017), Plaintiff's white co-worker, Ms. Smith, saw pictures of Plaintiff's children and asked Plaintiff if they have "the same daddy." Docket No. 56 at 8–9.

---

[1] The Charge also mentioned that she was the only black medical assistant when Plaintiff began working at Precision. Docket No. 45-23 at 10. The Charge notes, however, that when she gave Defendant notice in mid-February 2023 "three of the four medical assistants were black." *Id.*

[2] The parties presented these incidents in a different order—the Court reorders these incidents in semi-chronological for clarity. Further, when the parties disagree about the facts or date of an incident, the Court credits Plaintiff's version of the facts, when Plaintiff's version is supported by evidence. For example, Defendant alleges Incident 6 occurred "shortly before July 12, 2021" but does not cite the record to explain where this date comes from. Docket No. 45 at 26. Accordingly, the Court relies on Plaintiff's testimony that this incident occurred in the summer of 2022, which is cited by both parties. Docket No. 55 at 182:25–185:17. Similarly, although Defendant represented Incident 4 occurred while Plaintiff was employed by Precision but Plaintiff's testimony posits that Incident 4 occurred sometime before July 26, 2019. *See* Docket No. 45 at 12 (discussing Plaintiff's testimony (Docket No. 55 at 209:6) that she reported this incident to her supervisor Tonya Kessler, who left the company on July 26, 2019).

**Incident 2:** Shortly after August 7, 2017, Ms. Smith stated that a black mutual acquaintance was from the "hood," that it was "not a good area," and that it was "poor." *Id.* at 9.

**Incident 3:** On March 5, 2018, while discussing a patient's comments about Fouke, Arkansas, Ms. Smith told Plaintiff "nobody from Fouke likes Black people," that Plaintiff "better be careful because she did not want to end up being locked in someone's basement the way people from Fouke normally feel." *Id*.; *see also* Docket No. 45 at 11–12.

**Incident 4:** Sometime before July 26, 2019, a patient told Plaintiff that he did not want "her Black skin touching his skin," and Dr. Wages laughed, said "Oh he's just old." Docket Nos. 56 at 11, 45 at 12–13.[3]

**Incident 5:** Sometime around 2020, Plaintiff's supervisor, Dr. Wages, told Plaintiff "God does not like Black people" Docket No. 56 at 18; *see also* Docket No. 45 at 13.

**Incident 6:** Sometime in the summer of 2022, Dr. Wages told Plaintiff's white co-worker, Samantha Rogers, "not to hire any more Black employees because when two or more are together, things change" while Plaintiff was present. Docket Nos. 56 at 18, 45 at 26.

**Incident 7:** Between January 31, 2022 and November 7, 2022 Plaintiff was paid less than her white co-worker Savannah Roberts, who held the position(s) of Precertification Specialist and New Patient Scheduler. Docket No. 56 at 19, 45 at 17 n. 9.

**Incident 8:** Throughout the entirety of Plaintiff's employment, Dr. Wages routinely commented to Plaintiff that Black patients "smell like weed" and "looked like they are on drugs." Docket Nos. 56 at 19, 45 at 28.

**Incident 9:** Throughout the entirety of Plaintiff's employment, Dr. Wages routinely denied pain medication to black patients two to three times per week but did not deny pain medication to similarly situated white patients. Docket No. 56 at 7.

## LEGAL STANDARD

Summary judgment exists, in part, "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). A court may grant summary judgment when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also*, *Celotex*, 477 U.S. at 327. A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*,

---

[3] At the hearing, Defendant argued this incident occurred while Plaintiff was employed at Precision. At this stage of litigation, the Court credits Plaintiff's version of the facts.

477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enterprises, Inc. v. American Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The movant bears the initial responsibility of demonstrating the absence of a genuine dispute. *See Celotex*, 477 U.S. at 323.

## DISCUSSION

Defendant's motion for summary judgment seeks dismissal of Counts I through IX. Docket No. 45. First, the Court notes that there is no dispute that Incidents 1 through 3 occurred while Plaintiff was employed by Precision, not Defendant. Further, these Incidents occurred outside of the statute of limitations period. While these incidents conceivably provide relevant background,[4] Plaintiff fails to address why Defendant should be held responsible for incidents that indisputably occurred when she was not employed by Defendant. *See* Docket No. 56. Accordingly, the Court's consideration of Plaintiff's race discrimination claims, hostile work environment claims, and constructive discharge claims focuses on the allegations related to Incidents 4 through 9.[5]

### I. Plaintiff's Pay-Disparity Race Discrimination Claims (Counts II, V, VIII)

Defendant argues that Plaintiff's pay-related race discrimination claims should be dismissed for three reasons. Docket Nos. 45 at 21–25, 57 at 6–8. First, Defendant argues Plaintiff did not exhaust her administrative remedies under the Texas Labor Code and Title VII because she made no mention of pay disparity in her EEOC Charge. Docket Nos. 45 at 22–23, 57 at 7. Second, Defendant contends that Plaintiff cannot establish disparate treatment because the white

---

[4] *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002) (stating that prior acts may be used as "background evidence in support of a timely claim").

[5] Although Incident 4 occurred outside the statute of limitations period, there is a genuine dispute over whether this incident occurred while Plaintiff was employed by Defendant or Precision and whether there was an intervening action by Defendant.

employee who briefly received higher pay—Savannah Roberts—is not similarly situated. Docket Nos. 45 at 23–24, 57 at 7–8. Finally, Defendant shows that there is no evidence that Plaintiff was denied any COVID-19 sick-pay. Docket Nos. 45 at 24–26, 57 at 6.

Plaintiff responds that even though the EEOC Charge does not mention any pay disparity, an EEOC investigation would have revealed her pay disparity based on her allegations that there was an averse workplace towards blacks. Docket No. 56 at 15–16. Plaintiff further argues that Ms. Roberts is a proper comparator because her job role was substantially similar to Plaintiff's because both jobs involved answering customer phone calls, facilitating patient referrals, maintaining medical charts, obtaining pre-certifications, and discharging patients. *Id.* at 17–18. Plaintiff's response provides no evidence or argument concerning her COVID-19 sick pay (*see generally*, *id.*)—at the hearing Plaintiff explained that the parties were in agreement that the COVID-19 sick pay claim could not survive summary judgment.

"To make out a *prima facie* case of discrimination in compensation, a plaintiff must show that [s]he was a member of a protected class and that [s]he was paid less than a non-member for work requiring substantially the same responsibility." *McElroy v. PHM Corp.*, 622 F. App'x 388, 391 (5th Cir. 2015) (citation omitted). Title VII and the Texas Labor Code require a plaintiff to exhaust their administrative remedies before filing a lawsuit. *See Walker v. Univ. of Texas Sw. Med. Ctr.*, 638 F. App'x 394, 394–95 (5th Cir. 2016). Here, Plaintiff's race discrimination claims (Counts II, V, VIII) cannot survive summary judgment because (1) Plaintiff's Title VII and Texas Labor Code claims were not exhausted, (2) she fails to present a similarly situated employee for her Title VII, Texas Labor Code, and 1981 claims, and (3) she fails to rebut the evidence that she received all COVID-19 sick-pay and benefits.

First, the Charge did not exhaust Plaintiff's pay-related claims. Lawsuits that exceed the scope of an EEOC complaint are not condoned because they would "thwart the administrative process." *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008). A party must file a timely EEOC charge for each "discrete. . . . discriminatory act" or else "lose the ability to recover for it." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 110. Receiving pay at a discriminatory rate is a discrete discriminatory act. *See Niwayama v. Texas Tech Univ.*, 590 F. App'x 351, 356 (5th Cir. 2014). Nevertheless, the Court applies "a 'fact-intensive analysis' of the administrative charge that looks beyond the four corners of the document" to determine whether the allegations in Plaintiff's Charge would lead an EEOC investigation to reveal discrete incidents of pay disparity. *See McClain*, 519 F.3d at 273.

Plaintiff's Charge makes no allegation that could reasonably be tied to Defendant underpaying Plaintiff due to her race. *See* Docket No. 45-23. Instead, Plaintiff's allegations focus on the treatment of black patients and Dr. Wages and Ms. Smith's "offensive, derogatory comments about blacks." *Id.* at 10. These allegations about the work environment culture would not have reasonably flowed into an investigation into Defendant's pay practices. *See e.g.*, *Dixon v. Moore Wallace, Inc.*, No. CIV.A. 3:04-CV-1532-D, 2006 WL 1949501, at *6 (N.D. Tex. July 13, 2006), *aff'd*, 236 F. App'x 936 (5th Cir. 2007) (finding a plaintiff did not exhaust a pay discrimination claim because she failed to mention anything "about any type of pay differential between herself and other employees. . ."). Similarly, Plaintiff's complaint about the lack of black medical assistants when she began working would not reasonably lead to an investigation of Defendant's pay structure—especially because Plaintiff admits that when she quit "three of the four medical assistants were black." Docket No. 45-23 at 10. Plaintiff's argument that her Charge should be liberally construed to include discrete pay disparity claims is unpersuasive because

Plaintiff was represented by counsel when filing the Charge. *Id.* at 7, 21. For these reasons, Plaintiff did not exhaust her administrative remedies as to the discrete discriminatory act of pay disparity.

Second, even if Plaintiff had exhausted her administrative remedies, all her claims of pay-related race discrimination would fail because Ms. Roberts is not an apt comparator.[6] It is undisputed that Plaintiff was employed as a certified medical assistant and a certified medical assistant case manager—clinical positions that required Plaintiff to have a medical assistant certification. Docket No. 45-9, 45-15. Contrastingly, Ms. Roberts was required to have a billing and coding certification because she worked in a dual-functioning administrative capacity as a precertification specialist and as a referral coordinator/new patient scheduling coordinator. *See* Docket Nos. 45-38, 45-39, 59-3. Even though Plaintiff and Ms. Roberts may have held some of the same job duties, they are not comparable employees because they held different job titles and their respective positions require different levels of skill, responsibility, and certifications. *See e.g.*, *McElroy v. PHM Corp.*, 622 F. App'x 388, 392 (5th Cir. 2015) (finding employees with the same job title who engaged in similar types of work were not similarly situated because they were hired at different times and had different responsibilities); *see also Jackson v. Honeywell Intern., Inc.*, 601 F. App'x 280, 285 (5th Cir. 2015).

For these reasons, Defendant's motion for summary judgment on Plaintiff's pay-related race discrimination claims (Counts II, V, VIII) is **GRANTED**.

## II. Plaintiff's Hostile Work Environment Claims (Counts I, IV, VII)

Defendant also seeks summary judgment on Plaintiff's race-based hostile work environment claims. Docket Nos. 45 at 26–35, 57 at 8–10. Defendant first argues the Title VII and

---

[6] Defendant also provided substantial evidence that Plaintiff received all her COVID-19 sick pay and benefits. As noted above, Plaintiff admitted at the hearing that summary judgment is appropriate on this issue. *See generally* Docket No. 56; *see also* Docket No. 57 at 6–7.

Texas Labor Code hostile work environment claims should be dismissed because Plaintiff failed to exhaust her administrative remedies because her Charge does not use the words "hostile" or "harassment" and relies on allegations outside the statute of limitations period. Docket No. 45 at 26–35. Defendant also argues that summary judgment is proper because Plaintiff's allegations do not show that she, herself, was subjected to unwelcomed harassment based on her race. Docket No. 45 at 27–30. Defendant explains that most of these alleged comments are time-barred, were only heard in passing, or directed towards patients—not Plaintiff—and were relevant to patient care and treatment. *Id.*; *see also* Docket No. 57 at 8–9. Defendant also argues Plaintiff is unable to show this conduct is severe or pervasive enough to affect a term, condition, or privilege of employment because the cited incidents are not severe. Docket Nos. 45 at 30–34, 57 at 10. Plaintiff also only complains of a handful of Defendant-related incidents over a years-long period—the most recent incident occurring three months before she quit. Docket No. 45 at 30–34. Moreover, Plaintiff testified that she was able to always perform her job duties satisfactorily and she was promoted several times and received several pay increases. *Id.* Finally, Defendant argues there is insufficient evidence that it knew or should have known about the alleged harassment and failed to take prompt remedial action. *Id.* at 34–35.

      Plaintiff responds that the totality of the circumstances—the nine incidents—shows that Defendant's work environment was hostile. Docket No. 56 at 21–23. Plaintiff believes her hostile work environment allegations were exhausted because her Charge did not need to use the specific words of "hostile" or "harassment" given the subject matter of the allegations and her statement that the work environment was "averse" to blacks. *Id.* at 20–21. Plaintiff argues Defendant mischaracterizes the evidence because Dr. Wages's statements (Incidents 5 and 6) were made during conversations with the Plaintiff or in her direct presence. *Id.* at 21–23 (citing Docket No.

55 at 182:25-185:17, 188:1–23). Plaintiff argues Defendant knew, or should have known, about these incidents because they either happened in the presence of Plaintiff's supervisor or were reported to Plaintiff's supervisor. *Id.* at 9–12. Plaintiff also argues that the statements and behavior towards black patients are relevant because this second-hand harassment is highly probative of a hostile work environment. *Id.* at 23–24. Plaintiff shows patient discrimination by relying on her own observations concerning patient care as well as Dr. Wages's admission that he did not "think it would be inappropriate to withhold medication because of someone's race." *Id.* at 29 (citing, *e.g.*, Docket No. 56-2 at 44:24-45:2). At the hearing, however, Plaintiff admitted that her concerns about the disparate treatment of black patients were not communicated to Defendant until the day she quit.

"To establish a claim of hostile work environment, a plaintiff must prove he (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment complained of was based on his membership in the protected group; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 399–400 (5th Cir. 2021). As discussed above, several of the alleged incidents occurred while Plaintiff was employed by another company, and Plaintiff's pay disparity claim does not have merit. Moreover, at the dispositive motion hearing, Plaintiff conceded that Defendant did not know Plaintiff had concerns patients were being mistreated (Incidents 8 and 9) until the day she resigned. Accordingly, Plaintiff fails to explain how Defendant knew, or should have known, that she believed black patients were subject to disparate treatment. Accordingly, the Court focuses its hostile work environment analysis on Incidents 4, 5, and 6 because Plaintiff fails to show the actions of different coworkers that occurred years ago while she was employed by a

different company (Incidents 1–3) are related and continuing. *See West v. City of Houston, Texas*, 960 F.3d 736, 741 (5th Cir. 2020

There is no question that Incidents 4, 5, and 6 are race-related, abusive, and inappropriate. Defendant is correct, however, that Incidents 4 and 5 considered alone, or in combination with the other allegations, do not rise to the level of severity necessary to maintain a hostile work environment claim. *See Baker v. FedEx Ground Package Sys. Inc.*, 278 F. App'x 322, 329 (5th Cir. 2008) (affirming dismissal of a hostile work environment claim because they were not sufficiently severe and did not unreasonably interfere with the plaintiff's work performance). For example, in *Baker*, comments like "whites rule" and "she did not want to work with people like" the black plaintiff were not sufficiently severe to maintain a hostile work environment claim. *Id.* The Fifth Circuit recently allowed a complaint to survive a motion to dismiss because "[p]erhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment' than the use of an unambiguously racial epithet such as [Lazy Monkey A__ N____] by a supervisor in the presence of his subordinates." *Woods v. Cantrell*, 29 F.4th 284, 285 (5th Cir. 2022). Here, one of Plaintiff's supervisors—Dr. Wages—stated that "God hates black people" in front of Plaintiff and other co-workers. While this statement does not use the specific racial epithet at issue in *Woods*, the statement conveys a similar sentiment, especially when considered in combination with the other alleged incidents.

Despite the unacceptable, race-directed nature of the alleged incidents, including Dr. Wages's alleged treatment of black patients, Plaintiff's hostile work environment claim must fail. Plaintiff fails to provide sufficient evidence that these incidents affected a term, condition, or privilege of employment. At the hearing, Plaintiff admitted there was no dispute that Plaintiff was successful when she worked for Defendant. Plaintiff received good performance reviews, as well

as multiple promotions and raises. *See e.g.*, Docket No. 55 at 103:17–104:8, 105:10–106:14, 110:15–112:12, 117:21–122:2. Plaintiff further admitted that, even though "[i]t was hard," she was always able to perform her job duties satisfactorily. Docket No. 55 at 135:7–10, 264:11–265:15. She also testified that her mental and emotional condition did not affect her ability to work while employed by Defendant and that her mental and emotional condition had not changed in that time period. *Id.* at 14:25–15:7. Plaintiff also recommended that other individuals apply to work for Defendant—including black individuals who were eventually hired. *See e.g.*, *id.* at 96:6–97:7, 98:3–7, 99:13–24. While there is evidence that Plaintiff was—understandably—upset by these nine alleged incidents, Plaintiff simply fails to show that any of these incidents, alone or in combination, affected a term, condition, or privilege of her employment. *See e.g.*, *West*, 960 F.3d at 743 (affirming summary judgment dismissing a hostile work environment claim when plaintiff failed to show her coworker's behavior affected a term, condition, or privilege of employment); *Holmes v. N. Texas Health Care Laundry Coop. Ass'n*, 304 F. Supp. 3d 525, 547 (N.D. Tex. 2018) (granting summary judgment dismissing hostile work environment because there was no evidence showing she failed to perform her job, was discouraged from continuing to work, or failed to advance her career). There is simply insufficient evidence that Defendant's work environment seriously affected Plaintiff's psychological well-being to the point it detracted from her job performance, discouraged her from remaining on the job, or stopped her from advancing her career. *See Harris v. Forklift Sys.*, Inc., 510 U.S. 17, 22 (1993) (explaining how harassing conduct an affect an employee's psychological well-being without reaching the level of a "nervous breakdown").

For these reasons, Defendant's motion for summary judgment on Plaintiff's hostile work environment claims (Counts I, IV, VII) is **GRANTED**.

### III. Plaintiff's Constructive Discharge Claims (Counts III, VI, IX)

Defendant contends Plaintiff's constructive discharge claims should be dismissed because she cannot meet the higher threshold required by a constructive discharge claim. Defendant relies on extensive evidence that Plaintiff was treated favorably during her employment—receiving many promotions, pay raises, and even having positions created for her. Defendant also relies on evidence that Plaintiff resigned to pursue a make-up career and was asked to stay. Finally, Defendant argues that the complained of conduct occurred well before her resignation.

Plaintiff responds that Defendant has created a false narrative that Plaintiff quit to pursue makeup full time when the evidence shows Plaintiff "continuously looked, and applied for, other medical assistant positions both before and after her employment with Defendant ended." Docket No. 56 at 36. Plaintiff does not address the fact that she received multiple promotions, was asked to stay, or the fact that the complained-of conduct occurred years to months before her resignation.

The summary judgment evidence fails to meet the higher standard required for a constructive discharge claim. *See e.g.*, *Gonzalez v. Smith Int'l, Inc.*, 899 F. Supp. 2d 622, 643 (S.D. Tex. 2010) (allowing certain plaintiffs to proceed on hostile work environment claims but dismissing constructive discharge claims because of the higher standard). To determine whether an "employer makes working conditions so intolerable that a reasonable employee would feel compelled to resign" the Court examines the following relevant factors:

(1) demotion;

(2) reduction in salary;

(3) reduction in job responsibilities;

(4) reassignment to menial or degrading work;

(5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or

(6) offers of early retirement that would make the employee worse off whether the offer were accepted or not.

*McCoy v. City of Shreveport,* 492 F.3d 551, 557 (5th Cir. 2007), *abrogated by Hamilton v. Dallas Cnty.*, 79 F.4th 494 (5th Cir. 2023).

Here, considering the summary judgment evidence in the light most favorable to Plaintiff, a reasonable person in the plaintiff's shoes would not have felt compelled to resign. Plaintiff does not satisfy factors 1, 2, 3, 4, or 6. Contrastingly, Defendant provides unrebutted evidence that Plaintiff was promoted several times, received several increases in salary and job responsibilities, was not reassigned to menial or degrading work, and was not made offers of early retirement. Indeed, the undisputed summary judgment evidence shows positions were created for the purpose of *promoting* Plaintiff and that she was asked not to resign. *See supra* Section II.

The only evidence Plaintiff provides in support of her constructive discharge claim is the same evidence used to support her hostile work environment claim. But, even under factor 5, this evidence is not sufficient to survive summary judgment because Plaintiff fails to show these incidents were "calculated to encourage the employee's resignation." *McCoy*, 492 F.3d at 557. Plaintiff admits that when she resigned she commented that she would "rather just do makeup than . . . have to watch the patients be treated this way." Docket No. 56 at 36–37. Putting aside Plaintiff's admission at the hearing that the Defendant did not know of this concern until she resigned, Plaintiff admits evidence of secondhand harassment carries less weight (*see id.* at 28) and fails to show that Defendant's treatment of patients was calculated to encourage her resignation. *See Gonzalez*, 899 F. Supp. 2d at 642 (granting summary judgment on a plaintiff's constructive discharge claim because the reasons provided for quitting did not sufficiently establish intolerable working conditions for him). The incidents that could be interpreted as being directed towards

Plaintiff—Incidents 4 through 6[7]—also do not satisfy this factor because they occurred well before she quit. *See id.* at 642–43 (granting summary judgment on a plaintiff's constructive discharge claim, even though he was demoted, because he continued to work with his alleged harasser for years).

For these reasons, Plaintiff's evidence does not show that the alleged harassment was severe or pervasiveness enough to establish a constructive discharge claim. Accordingly, Defendant's motion for summary judgment on Plaintiff's constructive discharge claims (Counts III, VI, IX) is **GRANTED**.

## CONCLUSION

For these reasons, it is

**ORDERED** that Defendant's Motion for Summary Judgment (Docket No. 45) is hereby **GRANTED** and Counts I–IX are **DISMISSED WITH PREJUDICE**.

**So ORDERED and SIGNED this 25th day of July, 2024.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

---

[7] As mentioned, Incidents 1 through 3 occurred when she was employed by Precision, years before Plaintiff resigned.